Your Honor, if I could make one correction, the appellant's time is split between two counsel, myself and Mr. Kress. I will be proceeding first for ten minutes and I'll be followed by Mr. Kress on the appellant's side and then Mr. Love and Mr. Lynn on the appellant's side. Okay, thank you. Thank you, Your Honor. We appreciate it. Mr. Court. Thank you, Your Honor. Jason Pepe, counsel for Objector Appellant McCain. I'd like to reserve two minutes rebuttal time. This court should reverse the district court's order denying my client attorney's fees because that order is fundamentally at odds with itself. On the one hand, the district court makes the following statement and makes it clear, I overruled all of Mr. McCain's objections. But then in the order, it says, well, to the extent those objections appear in my order, I would have made that argument myself. I would have gotten it to it on my own. Additionally, it said with regard to the Ratner objection, that to the extent it appears in my order as well, it was duplicative and therefore I'm going to deny the fees. Those are mutually exclusive positions to take and it's that inconsistency that corrodes the structural integrity of that order. To be sure, we made these objections in the district court. And this court can draw a direct straight line, Your Honor, from the objections raised in the briefing in the district court to the court's order. If the court were to look at the record and look at the objector's brief, Roman 3A and B makes these three objections. You can draw a straight line to the district court's order making the same arguments in Roman 5 in A and B. And so in that process, the district court made two errors of all. The first is it dismissed Mr. McCain's Equifax objection. And I'll quote the district court because the court would have consider it even in the absence of an objection. This court in Rodriguez 2 has already held that that rationale as a matter of law is invalid. Additionally, this court has recognized that objectors are not required to be mind readers or clairvoyant. That is to predict what a district court may or may not eventually get to or how it will decide an issue. The district court in this case very well could have gotten to that issue. A very learned and experienced district court judge. But the policy implication here is that we must afford objectors to come to court and make these objections without fear or concern that their arguments will ultimately be denied. That would have a tremendous chilling effect on objectives, which this court has recognized as being extremely useful and necessary to this process. The second mistake of law is that the district court incorrectly applied the law regarding duplicity of effort. That body of law pertains to instances where other objectors merely parrot the arguments of other objectives. What happened in this case, Mr. McCain went back, found an eagle in the haystack, went back and found one entry in the court docket of 536 docket entries. Found it. It had been in the docket for two years, found these data points that plaintiff's expert had relied upon, extended those data points to the Equifax settlement, then offered the court the following analysis. If you compare the relative per capita settlement values of the three bellwether cases the court was comparing the Yahoo settlement against, you would see that it was not a very successful endeavor at all. And it was for that reason the court should deny these and ultimately did. Pointing the court again back to his opinion and Rodriguez to this court in that case reversed a district court who had denied attorneys fees by objectors on the grounds and I'll quote that the district court had relied on its own analysis of the case law. And I'll quote again, the district court had not focused on the incentive agreements before the objectors raised the issue. That's what happened in this case. None of the objections that Mr. McCain raised are contemplated by any party or the district court. And so as a matter of law, the district court made that mistake. That rationale has been rejected by this court. It's also been rejected by the Seventh Circuit. We cite in our papers the Reynolds case, and it provides a little bit of a policy rationale for that. We can't adopt a rule forcing objectors to be mind. Objectors come into this case, taking significant risk, performing that service and doing a significant amount of that work ahead of time. And so they need to be able to rely upon a safe harbor, if you will, your honor. That is, up until the district court acknowledges or gives some sort of reasonable notice that a party or an objector could then determine, well, yes, the district court has or will get to that issue. Additionally, in addition to chilling the participation of objectors in this process, it would basically be a subjective rule. The court's analysis was saying, I would have gotten to that issue later. Well, that could vary across the district court judges. And some district court judges may have gotten to that issue. They may be too busy, or maybe they have fewer clerks. But we can't allow an objector's eligibility for fees to turn on each individual federal judge hearing that case. And in our 28-J that we filed with the court, we point this panel to a First Circuit opinion, LEAF, that came out just a couple of days ago. And the First Circuit points out that district courts are particularly vulnerable into being misled by class counsel misrepresentations regarding fees. And that's principally because it's an ex parte proceeding. And so it's essential that objectors perform this duty to perform a check on overreaching by class counsel, which is exactly what happened in this case. Their fee request was cut $7 million. And it was largely based on the arguments that Mr. McCain brought to the court's attention. With regard to the district court's comments at the fairness hearing, this is very, very important. The district court herself attributed the Equifax argument to Mr. McCain, and then put that argument to class counsel to address the very definition of the adversarial process. I'll quote the district court. Let me ask the last question with regard to Mr. McCain's objections, and that they are saying the amount of attorney's fees in Equifax is actually 20%, and not 20, excuse me, 20.3%, but plaintiffs have represented that it was 25%. So what's your response to that? That is the very definition of the adversarial process, the value, the significant contribution that Mr. McCain brought to this case, because ultimately, they didn't have a good response. They said it was an ambiguity. I'll pass the electorate to counsel. Thank you, Your Honor. Mr. Pepe, for your planning purposes, although you were down to about two minutes, we'll give you... Oh, excuse me, Your Honor. I had my clock on my iPhone. That's okay. Ran a little quick. If I may continue. Yeah. Well, you were down to about two minutes. I thought you wanted to make rebuttal. I do, Your Honor. I misunderstood your last comment, and I will pass the electorate and take those two minutes of rebuttal. Thank you. Okay. For planning, I'll give you a full three minutes of rebuttal. Thank you, Your Honor. Okay, so I guess now we have Mr. Kress. Good morning, members of the court, judges. May it please the court, my name is John Kress. I represent Appellant Aaron Miller, an objector in this data breach case against Yahoo. I'll get right to it. Our point is a very important one, and it was a point that is not settled at all in the actual order of the court that was entered back in July of 2020. There's 194 million unnamed class members that are impacted by this particular data breach case with Yahoo. And there is one particular vendor that has been selected to administer a bulk of the relief to the class members, and that is All Clear ID. And our objection and what we raised was that there were a number of complaints that were filed on different web pages between a five-year period roughly from 2015 through, I would say, 2019 or so. And they involve dissatisfaction of consumers, many of them class members, from other data breach cases. For example, in our brief, we mentioned Home Depot and the Blue Cross Blue Shield. Many of these complaints talk about how the product was worthless, that it did more harm than good, that it was foisted upon them, that they didn't have a choice. Or, for example, that the so-called services that were rendered were deficient because the class member or the consumer would receive notification that their information had been used improperly but weeks or sometimes months after something adverse had happened. Their credit card had been used or a mortgage or money had been taken, things of that sort. So all these complaints, there were approximately 115 of them, were presented to the trial court and with the concern being that the court has a duty to look under Rule 23 and to really investigate and to vet, if you will, All Clear ID. Mr. Kress? Yes, Your Honor. I want to interrupt, but I want to clarify something. How long were you planning to make your arguments? Thank you so much for interrupting me and asking me. I apologize. I was nervous. I was hoping for two minutes for rebuttal. My apologies. Thank you for asking. And what's the total time you should have started with? The total time I would have then would be eight minutes instead of ten. I would have two minutes for rebuttal. My apologies. So that's okay. So you want to make a two-minute rebuttal? Yes, Your Honor. Why don't you go ahead? I've used up a lot of your time. I just want to get right into it. I have a lot to say and I know I have a limited time within which to do that and to answer questions. What we found, what had happened is that we pointed out to the court that there were these concerns that we had. And they were very important because it affects 194 million people across the United States. And this, again, is the primary relief that these class members would receive, that is, protection of their private and their information, credit protection, if you will, or credit monitoring. Sometimes this is referred to in the industry as well. And it was given a value by class counsel. It was identified, I want to say, about $14, I think it was $15 a month. But it was assigned a dollar value and an amount would be paid out to All Clear ID, I believe, the amount of $24 million. And so we were very concerned that class members who would participate in this class action had to take the credit monitoring with All Clear ID. And the only way you could get away from that is if you already had credit monitoring with another service. And then perhaps you might be eligible, I believe, for up to $100. And within this backdrop, we objected. We pointed these things out to the court. And in the court's opinion in July of 2020, I believe it's at ER 36, you're going to find there's about four sentences total. And those four sentences are very important, not only because of what they say, but what is absent in that 88-page opinion. The first two paragraphs are more perfunctory and really get into introducing that Mr. Miller had objected. And they're basically saying that the settlement is fair and it is adequate to the class. And then there is a statement, I believe it's sentence three, that talks about All Clear ID administers this service to over 2 million people across the globe. And then the last sentence, sentence four, says, moreover, All Clear ID possesses an A-plus rating from the Better Business Bureau. And then gets into some other statistics that were included in this declaration from All Clear ID from the gentleman CEO named Bo Holland. The problem is that we believe what's happening here is that the district court has delegated its duty of inquiry, almost created a new standard, if you will, the Better Business Bureau standard, saying, well, I don't have to look at this. They have an A-plus rating. And because they have an A-plus rating with the Better Business Bureau, we're going to let 194 million people get the services from this company that's being paid $24 million without any further inquiry. And we believe that is not the law. That is not the law on the circuit. And that the cases that we have cited support that the Better Business Bureau was never intended to be used in this manner. The Better Business Bureau is a case in the Northern District from 2013 that talks about their current website, the Better Business Bureau, and that their purpose is still that they are not to be used as an advocate for any particular side or for a purpose. In fact, the cases that we cite in our brief going back to 1941 and 1945 with the 10th Circuit and the United States Supreme Court, respectively, talk about the purpose of the Better Business Bureau is to educate consumers and to promote business among those merchants. And that we also find in there is there's an inherent conflict of interest. There's a tension. The Better Business Bureau, they want to help the consumer, but then the issue also becomes they're also trying to aid the business owners and promote their interests as well. And what we are concerned with is that these are the only four sentences in these 88 pages that go to the sufficiency or the, what I would call the investigation or inquiry into all clear ID. More needed to be done. Much more needed to be done and was not done. And if this case is affirmed, the concern that we have, and I believe what could be created is the Better Business Bureau standard of review that in the future, other class counsel, other courts will be able to look to and say, well, instead of performing as the court, we'll just simply look for the A plus rating of the Better Business Bureau. And then we can move on and rubber stamp and do whatever we need to do at that point without doing the full inquiry that they should be required to do. And that's what we believe would happen, would need to go back to the trial court so that the court can determine these complaints, whether or not these problems still exist because there were 115 complaints and what efforts have been undertaken by all clear ID to keep these complaints from occurring in the future or now. And also whether or not all clear ID would even be the appropriate vendor given the circumstances. But what the court mentioned and is in the declaration of all clear ID, we're looking at, they claim that they have represented over 2 million people across the world. Here we're talking about 194 million class members. Looks like a lot more to chew off for all clear ID than perhaps that they've looked at before. But we don't have any data, we don't have any indication of that. It doesn't appear that the court looked at any of that. All we have are these really four sentences. And there's this opinion, obviously the judgment, and getting into all these other very intense and very important factual scenarios that were analyzed, we believe, very appropriately. And this particular one, which really goes to what the class members should ultimately receive, we think it was looked at and it was simply, well, that's the Better Business Bureau, I don't have to do anything further. And even when you look at that sentence, moreover, all clear ID possesses an A-plus rating from the Better Business Bureau, the definition of moreover is besides or as a further matter. And the way I would read that is that the court was saying that, well, even if there's 115 complaints, we're not going to bother with that because they have an A-plus rating. And that's a concern also because how would that rating be established? Did the court look at that? There's all these other things that would come into play. But the most important is that the Better Business Bureau itself has stated on numerous occasions that they're not to be used for purposes of advocacy. That's not the role or their function. And as such, we believe that this case needs to be returned back to the trial court and then properly vetted and investigated and proper inquiry made under Rule 23. I have nothing further. Thank you, Mr. Gress. For planning purposes, I'm going to let you have your two minutes of rebuttal after we hear from Appellees. And if Appellees want a little extra time since I'm giving it to you and Mr. Pepe, then Appellees can also have a couple of minutes extra. Consider it a gift from the pandemic. OK, so on the Appellee side, who argues first? Is it Mr. Love or Mr. Lynn? Yes, Your Honor. Good morning, Your Honors. And may it please the Court, Andrew Love for the plaintiff's Appellees. I think I'll address Mr. Miller's appeal first, if that's OK with the Court. Joe's review of the settlement in this case was a textbook example of appropriate discretion. She held two preliminary hearings before granting preliminary approval and then granted final approval in an 88-page opinion after holding a three-hour hearing in which she allowed every objector to have their say and address objections. And given such careful review, this is just not one of those rare cases where this Court should set aside its determination that the settlement was fair, adequate, and reasonable. The Court did not clearly abuse its discretion in finding, after considering and weighing the evidence, that the relatively small sample of complaints with regard to all-clear ID— there were 115 complaints out of, as the Court noted, over 2 million customers— that this did not render the settlement inadequate as a whole. The Court did not simply delegate its fact-finding to the Better Business Bureau. The Court noted that there was a small amount of complaints that not only— and some of those complaints actually were from the Better Business Bureau, so the fact that Mr. Miller argues that somehow the Better Business Bureau is not an appropriate source is somewhat ironic. But also, the Court relied on the fact, unrelated to the Better Business Bureau, a 96% satisfaction rate and 100% success in resolving financial identity theft. So, unless the Court has further questions on Mr. Miller's appeal, I'd like to move to Mr. McCain's appeal. So, Mr. McCain's objections were directed at Class Counsel's request for a fee amounting to 25.5% of the recovery, but for reasons having nothing to do with Mr. McCain and following this Court's precedent, the District Court rejected Class Counsel's request for a percentage of recovery fee using the percentage of recovery method and instead utilized the Lodestar method. And the Court then calculated the Lodestar, carefully reviewing Counsel's hours and billing rates, and then reduced Counsel's requested fee of $30 million to roughly $22 million, based on the Lodestar calculation and then added a very small amount of multiplier. So, given that Mr. McCain's objections were in the context of objecting to the percentage of recovery, which the District Court only used as an optional cross-check. So, after doing the Lodestar calculation, the Court spent a little bit of time with the percentage of recovery looking at, which was 19.4%, as an optional cross-check. And that's where Mr. McCain's objections, if they're at all relevant, came into play. And so, given that that's the context of these objections, and the Court, in finding the percentage of recovery, supported the Lodestar calculation, his objections were among many other factors that the Court considered for this cross-check.  And that's the key, is whether or not, regardless of when issues were raised, when objections were raised, did those objections substantially benefit the class? And given that these objections were in the context of a percentage of recovery optional cross-check, they did not. Going to the particular objections, so the per capita analysis, which the Court didn't even use with regard to the percentage of recovery cross-check, but in looking at whether the modest multiplier was appropriate, was already on the Court's radar through a declaration from plaintiff's expert, which Mr. McCain cited. But also, it was hardly a revelation that the class size, in this case, compared to the settlement, was some novel issue. The Court talked about it repeatedly, especially because she presided over the Anthem case, which had roughly the same settlement amount, but a class that was about a third of its size. And so, throughout, in the hearing for preliminary approval, and then in the final approval, and in the Court's order, the Court discussed that this case was not going to get a huge multiplier, or a huge benefit because of the class size, and repeatedly compared it to Anthem. And so, the fact that Mr. McCain has a chart that focuses on the per capita analysis of Anthem and Equifax did not have a substantial benefit since this was already on the Court's radar. With regard to the Professor Miller's declaration, which the Court, as it put, gave a grain of salt, Mr. McCain made some objections to Professor Miller's, the cases, the subset of cases, and Professor Miller's declaration, which was different from the earlier Miller studies. That was a different approach than the approach that the Court used, which also criticized the subset of cases. Mr. McCain focused on, did Professor Miller just focus on cases above 100,000, 100 million, where the Court looked at the difference between the subset of cases in the prior studies, which was 70 to 175 million. She noted that the 19 cases that Professor Miller focused on were 75 to 150 million. A different approach, Mr. McCain's different criticism of Professor Miller did not make it into the Court's opinion, did not have a substantial benefit. And finally, with regard to the Equifax, the disparity between whether or not it was a 25% of recovery, or 20.6% recovery, which Mr. McCain pointed out, again, not a substantial benefit, particularly because the Court noted even a more significant factor with regard to Equifax, which was the percentage of recovery in Equifax was likely to be much lower, closer to 15% of recovery, given the additional amount of costs that were going to be added to the settlement fund in Equifax. So again, none of Mr. McCain's objections had a substantial benefit. And finally, with regard to sort of this policy point that Mr. McCain brings up, that even assuming objectors, you know, who arrived at things where the Court found, would have found the issue on its own, you know, shouldn't the objector get the benefit of that? Well, again, the law in this circuit still has to be a substantial benefit. Rodriguez, Vizcaíno, a long line of cases. And otherwise, you know, if it were otherwise, then an objector could raise, you know, kitchen sink arguments, obvious arguments, arguments that would have been obviously apparent to the Court, even if they hadn't been mentioned. And then if the Court happened to address one of those, then claim that it was all, you know, their idea. And so the key again is substantial benefit. Mr. McCain's objections did not benefit the class. And so the Court did not clearly abuse its discretion. Thank you. Mr. Love, thanks for your argument. Mr. Lin. Thank you, Your Honor. My name is Albert Lin. It may please the Court. I'm here on behalf of the defendants. Your Honors, as we explained in our briefs, defendants take no position on most of the issues in these consolidated appeals, specifically the fee issue and the incentive award issue raised by Mr. McCain. And the reason for that is that the settlement agreement makes it very clear that, one, the distribution of fees and the incentives award has no bearing on the amount that the defendants contribute to the fund. It is a non-reversionary common fund. It's $117.5 million no matter what happens with the fees and the awards. And secondly, the settlement agreement specifically states that the district court's order and any orders on appeal with respect to the fees and the awards do not affect the effectiveness of the settlement agreement. The one issue that we do address is Mr. Miller's substantive objection. That is the only substantive objection to the settlement agreement on appeal. And with that, I agree with everything that Mr. Love said. If I could add just a couple points. The first one is I agree with Mr. Love that this is a textbook example of what a district court should do. And not only did the district court judge here do all the things that Mr. Love mentioned, which is ask for supplemental submissions, conduct a very long fairness hearing, but before all of that, she rejected the first proposed settlement agreement raising a number of concerns, all of which were addressed in the second proposed settlement agreement, which she then noted had been addressed by the parties. As to the specifics of Mr. Miller's objection, one, there's, I think, a couple different ways that that can be turned aside. The first is, as Mr. Love pointed out, it is based on a factual error. My friend representing Mr. Miller has asserted a couple times that the district court delegated her responsibility to the Better Business Bureau, relied only on the A-plus rating, but on the very page that he points you to, Your Honors, you can see that the district court judge did not rely solely on the A-plus rating, as Mr. Love pointed out. So there's a factual problem. But then the other two points I have are legal. The first one is, as this court has said, its review of an approved settlement agreement in this class context is extremely limited and should be done on a holistic basis. You have to look at the whole agreement and as to whether it's fair. And Mr. Miller has not addressed whether the whole agreement, the fairness of the whole agreement, how that is affected by his specific objection to all clear. There are a number of other things in the settlement agreement, including business practice changes committed to by Yahoo! on the order of tens of millions of dollars that are newer to the benefit of the class that Mr. Miller has not addressed. And my final point on the law is Mr. Miller has suggested that the district court had some obligation to do an independent investigation into each one of these complaints that he's found on the Internet. There is no such standard. The review of the district court's certification here is for clear error. And as this court knows, and we quoted it in the briefs in the Springfield-Anderson case, it explains that the clearly erroneous standard, the question is whether the district court's account of the evidence, the evidence that was put before her, is plausible in light of the record viewed in its entirety. And the Court of Appeals may not reverse it, even if convinced that it would have weighed the evidence differently. So there's no obligation for the district court to go out and look for more evidence. And I'm not even sure what that would look like for her to inquire into these individual complaints. She looked at the evidence that was before her, that Mr. Miller had the opportunity to put before her. She weighed those things on the page of the order that Mr. Miller's counsel has pointed to. And she reached the reasonable conclusion that all clear was a service that would benefit the class. And for that reason, Your Honor, we would urge this court to refuse Mr. Miller's objection to the all clear piece of the settlement agreement and affirm the settlement agreement on its substantive merits. Thank you. Thank you, Mr. Lynn. Okay, now, I guess we'll hear from Mr. Pepe on rebuttal. You're on mute. Mr. Pepe's on mute. Thank you, Your Honor. I apologize. I want to address the point on obviousness. That is not this case. That's a hypothetical. What did happen in this case is you had class counsel creating this problem up until and at the fairness hearing. They were still misrepresenting to the court that the appropriate range for the Equifax settlement was 25%. As to the point on the percentage of recovery no longer being the primary basis for the court's view, it's still relevant. It's a critical component of the court's analysis. It's a cross check. It's just not some sort of, you know, inapplicable, just, you know, common sense query. So to the extent the percentage of recovery analysis would be faulty, so too would a fee award using either the percentage of recovery method or the lodestar method. And this notion that McCain's three objections were already on the radar screen, this is what they argue in their brief. This is what they're saying the district court had on its radar screen. And I'll quote the district court. And why should you get a multiplier? That's it. I don't know how you get McCain's three objections from that. If you look at the record, Your Honor, none of these issues were on the court's radar screen at all at the time Mr. McCain made those objections to the district court. And it's for that reason, under Rodriguez 2, this court should reverse the district court. It's just an invalid reason under this court's holding and for the policy reasons I discussed. As to substantial benefit, we know what the benefit is. The $7 million haircut on fees. The issue is who can take credit for that, right? And under this court's holding in Rodriguez 1, there's a very modest standard. It's merely having some effect on the outcome, the substantial benefit. And looking at the arguments, looking at the fairness hearing, look at the district court putting class counsel through their paces using Mr. McCain's arguments. It would be very difficult to conclude that Mr. McCain and counsel did not have some effect on the $7 million haircut and fees to the class counsel. So to affirm the district court in this case would mean that this court would be endorsing a rule of mind reading, of clairvoyance, that somehow objectors should be able to forecast and determine in the future whether a district court is going to find that needle in a haystack or is going to come to that argument. And that rationale has been rejected by this court as well as to the Second Circuit. Thank you very much for the court's time. If you want to ask any questions, I turn over the microphone. Any questions for Judge Rawlinson or Judge Hips? No, thank you. Thank you. Okay, we'll proceed with Mr. Kress. Thank you. I'd like to address Mr. Lynn primarily, but I would also include Mr. Love as well. There's been language used that this is a textbook example of what to do during a settlement. And there may be truth to that statement, but I think the quality of that is also true, is that what you shouldn't do. That paragraph or those few short sentences the court devoted to the appropriateness of all clear ID that is providing the primary relief to over 194 million people, no one is disputing the role or lack thereof that the Better Business Bureau shouldn't have, that its role is not being an advocate in these types of proceedings or any at all. No one's disputing that. Instead, what Mr. Lynn directed everyone to is, language of the court says, we should look at the entire settlement and look at everything that's transpired. And yes, there's truth in that, but that still doesn't get you past the abuse of discretion, where we have four simple sentences on E36 that simply lay out Mr. Miller's objection and then talk about how it's A plus approved by the Better Business Bureau, and we shouldn't need to look at anything further. And they have a customer satisfaction survey of 96% based on the declaration, I believe, of two pages of Mr. Bo Holland with all clear ID. I don't think it flies. I don't think it passes muster. I don't think it passes this court's test. And to simply avoid this and to affirm the trial court, I really would be very dangerous and create a slippery slope that now we've created a standard where someone can come in and say, well, we have an A plus rating for the Better Business Bureau. What is it next week? Is it a standard from Angie's list? If somebody has an issue and says, well, we've got this, we can show Craig's list gives you 100%. And that could also become a concern. And I realize that it may sound flippant, but there's a problem here. We don't have anything other than the court simply saying, I've looked at these 115 complaints. They have an A plus Better Business Bureau rating. Oh, and they've got these great reviews. They've got this great satisfaction rating. We don't believe that that's sufficient and that's not enough. And it needs to go back. And we think that everything in its totality, you can be blinded by the number of pages and the number of years that transpired with this case. And even the fact that the first settlement was rejected. But what can't be ignored under these circumstances is that really the only thing that the trial court has hung its hat on for approving this vendor is the Better Business Bureau. And we believe that that's not in the core of the law that we're working. And for that, we would ask that you return this case back. Thank you. Thank you. Thanks for your patience. I want to thank all the advocates for their excellent advocacy on both sides of the case. The arguments were very well done. And the court really needs your help and advocacy. And we appreciate it, especially when you take the extra risks you have to do to handle this remotely in a pandemic. So thank you for helping us out. The Schwartz v. Yahoo case shall now be submitted and the parties will hear from the court in due course. Thank you. Court will now adjourn. That's our last case. This court for this session stands adjourned.
judges: GOULD, RAWLINSON, Zipps